UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON

**United States of America**,

       *Plaintiff*,

v.                                      Case No. 3:15-cr-403 (1)
                                              Judge Thomas M. Rose

**William M. Apostelos,**

       *Defendant*.

---

**ENTRY AND ORDER DENYING MOTION FOR COMPASSIONATE RELEASE (DOC. 167).**

---

Pending before the Court is a motion by Defendant William M. Apostelos for a reduction of sentence under the compassionate release provisions of 18 U.S.C. § 3582(c)(1)(A). (Doc. 167). The Government filed a response. (Doc. 173). Defendant has provided the Court supplemental exhibits. (Doc. 176).

Defendant requests an order reducing his sentence to time served, or, in the alternative, modifying his judgment to allow the remainder of his sentence to be served on home confinement.

**I.    Background**

In his plea agreement, Apostelos admitted that:

> Between 2010 and October 2014, in the Southern District

>of Ohio, defendant Williams Apostelos, with the intentional help of other people, knowingly ran a fraudulent investment scheme that caused millions of dollars in losses to certain of its investors. . . .
>
>Using these companies, Mr. Apostelos convinced hundreds of individuals from around the country to place millions of dollars in assets under his control for the purpose of investment. In doing so, Mr. Apostelos often intentionally misrepresented the manner in which he intended to use his clients' money. For instance, he falsely assured multiple clients that he planned to invest their money in, among other things: the stock market; precious metals such as gold and silver; as well as real estate developments in Kentucky and Nevada. Mr. Apostelos further falsely agreed to provide his clients with periodic statements or information that accurately reflected the status of their investments.
>
>Based on these intentional misstatements and misrepresentations, hundreds of individuals transferred millions of dollars . . . to Mr. Apostelos with the understanding that he would make bona fide investments with their money. . . . . Rather than investing as promised the bulk of this money that he received, Mr. Apostelos with the intentional help of other individuals knowingly diverted his clients' money … for improper and unauthorized uses. For example, Mr. Apostelos knowingly and improperly used client funds intended for investment in the stock market to repay earlier investors in his scheme. Similarly, without authorization, he purposefully and fraudulently diverted portions of investors' money to pay his own employees; to fund the horse racing business of his wife; and to purchase real property for himself and his family such as 35 Commercial Way, Springboro, Ohio.
>
>To prevent detection of his intentional misuse of investors' funds . . . Mr. Apostelos and other individuals worked together to provide false information to [his] clients…. On occasion, Mr. Apostelos directed his employees to prepare and to mail statements that fraudulently described the purported positive growth of investors' funds. Additionally, when certain clients attempted to withdraw their investments…, Mr. Apostelos often directed his employees to provide these investors with intentionally inaccurate reasons for his inability to repay them, such as false claims that the companies' bank accounts had been hacked.

(R. 92, Plea Hearing Tr. 2/10/2017 at 484-87).

2

The Presentence Investigation Report ("PSR") noted that Defendant's conduct was not isolated, but rather spanned years. See PSR ¶¶ 30 - 59. It involved multiple fraudulent pitches from Defendant, including: the purported creation of a bank, his alleged investment in short-term bridge loans, his claimed management of T.D. Ameritrade Accounts and 401K plans; and his professed land deals. See id. ¶¶ 39-43. Moreover, in running this scheme, Apostelos managed the illegal activity of multiple people including his sister, niece and others. See id. ¶¶ 78-79. Through this extensive, manipulative conduct, Apostelos caused 249 investors to suffer devastating financial losses totaling over $30 million. See id. ¶¶ 74, 146. Based on these facts, the advisory Guidelines recommended a sentencing range of 188 to 235 months of imprisonment. See id. Sentencing Recommendation.

The PSR also detailed Apostelos' family history, explaining that Defendant was the child of Paul and Patricia Apostelos. See id. ¶¶ 97-98. Describing Patricia as his mother, the PSR stated that she raised Apostelos and that her marriage with his father ended in "1999/2000". See id. ¶ 98. At the time of the PSR – namely, May 2017 -- Apostelos' "mother reside[d] in [] assisted living", suffering from a terminal illness; she ultimately passed away in 2018. See ¶¶ 97, 98, 105 (detailing terminal condition of Apostelos' mother, Patricia Apostelos).

The PSR also noted that, when Apostelos was in his 40's, his father remarried, taking Barbara Apostelos (also known as Barbara Harper) as a wife in 2004. See id. The PSR contains no other mention of Barbara, whom Apostelos in his current motion now describes as his mother. See R. 167, Def. Mot. at 1071.

On August 2, 2017, the Court imposed a below guidelines 180- month term of imprisonment. See R. 80, Minute Entry; R. 81, Judgment. The Court did this in spite of

3

statements of several victims, who detailed how Apostelos' conduct had financially devastated them. See R. 93, Sent. Tr. at 542 – 543 (explaining Apostelos' theft of $500,000 life savings); id. at 544 (detailing inability to retire following Apostelos' scheme); id. at 546 (describing how, following defendant's theft, victim was losing home, had maxed out credit cards, and was serving a financial "live sentence"); id. at 547-48 (explaining how Apostelos' stole family farm through scheme); id. at 554-55 (detailing need to return to work at 73 to pay for spouse's medical bills and to have funds to live given Apostelos' theft of pension). Crafting the sentence, the Court observed that the defendant's conduct "was probably one of the most serious, most heartless, most callous, most harmful, both financially and emotionally, most calculated criminal offense that has come before me in 27 years on the bench." Id. at 565. It emphasized that, through years of lies, the defendant used sophisticated means to "purposefully hurt [his victims] over and over and over again." Id. Moreover, given the nature of the scheme, the Court had no "assurances or any comfort that a sentence other than a lengthy sentence would prevent [Apostelos] from re-offending or protecting the public." Id. at 568.

In May 2020, Apostelos filed in the Northern District of Ohio an emergency petition under 28 U.S.C. 2241 arguing that onset of COVID required his immediate release. See *Apostelos v. Williams*, 4:20-CV-962PAG (N.D. Oh. 2000), R. 1, Emergency Petition. In written filings, Apostelos acknowledged that he already had contracted COVID. See *Apostelos v. Williams*, 4:20-CV-962PAG (N.D. Ohio 2000), R. 8, Petitioner's Response in Reply at 56. Specifically, he complained that he "would not have contracted the coronavirus" but for BOP's decision to transfer him to a different unit with FCI Elkton. See id. The Northern District of Ohio denied Apostelos' petition, granting summary judgment to the United States. See *Apostelos v.*

4

*Williams*, 4:20-CV-962PAG (N.D. Oh. 2000), R. 10, Judgment Entry.

Defendant is a 61 year-old male currently housed at Elkton FCI. He is scheduled to be released March 4, 2029. www.bop.gov/inmateloc/ (Visited February 27, 2023). There are currently three inmates who have currently tested positive for Covid at Elkton FCI. www.bop.gov/coronavirus/ (Visited February 27, 2023). No staff members are positive. Nine inmates have died from Covid—none since Defendant filed his motion (cf. PageID 1070)—while no staff members have. In total, 528 inmates and 116 staff members have contracted and recovered from Covid, out of a population of approximately 1,609. https://www.bop.gov/mobile/about/population_statistics.jsp. (August 15, 2022).

Defendant submitted a request for compassionate release to the Warden of on June 10, 2021. The request was denied by the Warden on June 23, 2021.

**II.   Analysis**

Defendant asks the Court to grant him a reduction in sentence as permitted by 18 U.S.C. § 3582(c)(1)(A)(i) and to consider what he alleges are extraordinary and compelling reasons for doing so. Section 603(b) of the First Step Act, which was signed into law on December 21, 2018, modified 18 U.S.C. § 3582 to allow a defendant to bring a motion on his or her own behalf either "[1] after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or [2] the lapse of 30 days from the receipt of such request by the warden of the defendant's facility, whichever is earlier." 18 U.S.C. § 3582(c)(1)(A); Pub L. No. 115-391, 132 Stat. 5194; *see also United States v. Alam*, 960 F.3d 831, 833-34 (6th Cir. 2020) ("If the Director of the Bureau of Prisons does not move for compassionate release, a prisoner may take his claim to court only by moving for it on his own

behalf. To do that, he must fully exhaust all administrative rights to appeal with the prison or wait 30 days after his first request to the prison," and "[p]risoners who seek compassionate release have the option to take their claim to federal court within 30 days, no matter the appeals available to them") (internal quotation marks omitted) (alterations adopted).

A district court has limited authority to modify a sentence. "Generally speaking, once a court has imposed a sentence, it does not have the authority to change or modify that sentence unless such authority is expressly granted by statute." *United States v. Hammond*, 712 F.3d 333, 335 (6th Cir. 2013). Section 3582(c)(1)(A) created such authority in certain limited circumstances. It provides in part:

> The court may not modify a term of imprisonment once it has been imposed except that—in any case—the court … may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in [18 U.S.C.] § 3553(a) to the extent that they are applicable, if it finds that extraordinary and compelling reasons warrant such a reduction … and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.

18 U.S.C. § 3582(c)(1)(A)(i).

Thus, the Court can modify a term of imprisonment if it finds that (1) "extraordinary and compelling reasons warrant such a reduction," (2) "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission," and (3) such a reduction is appropriate "after considering the factors set forth in § 3553(a) to the extent that they are applicable." 18 U.S.C. § 3582(c)(1)(A)(i); *see also United States v. Kincaid*, 802 F. App'x 187, 188 (6th Cir. 2020); *United States v. Spencer*, No. 20-3721, 2020 U.S. App. LEXIS 28051, at *4, 2020 WL 5498932 (6th Cir. Sept. 2, 2020).

While judges "have full discretion to define 'extraordinary and compelling' without

6

consulting the policy statement § 1B1.13." *United States v. Jones*, No. 20-3701, – F.3d –, 2020 WL 6817488 at *9 (6th Cir. November 20, 2020), the Court references U.S.S.G. § 1B1.13 for guidance. Therein, the Sentencing Commission identifies four circumstances in which "extraordinary and compelling reasons" may exist. *See* 28 U.S.C. § 994(t) ("The Commission, in promulgating general policy statements regarding the sentencing modification provisions in § 3582(c)(1)(A) of Title 18, shall describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples"). United States Sentencing Commission, Guidelines Manual, § 1B1.13, at cmt. n.1 (Nov. 1, 2018) (Reduction in Term of Imprisonment Under 18 U.S.C. § 3582(c)(1)(A) (Policy Statement)). Those four circumstances are: (A) Medical Condition of the Defendant; (B) Age of the Defendant; (C) Family Circumstances; and (D) other extraordinary and compelling reasons. *Id.* Each of the four circumstances has its own parameters. *Id.* Commentary also confirms that, "[p]ursuant to 28 U.S.C. § 994(t), rehabilitation of the defendant is not, by itself, an extraordinary and compelling reason for purposes of this policy statement." *Id.* at cmt. n.3; *see also United States v. Keefer*, No. 19-4148, 2020 U.S. App. LEXIS 32723, at *6-7, 2020 WL 6112795 (6th Cir. Oct. 16, 2020) ("[i]n Application Note 1 to § 1B1.13, the Commission also listed the 'extraordinary and compelling reasons' that might entitle a defendant to a sentence reduction").

      The policy statement also encourages the Court to consider whether the defendant is "a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." *Id.*; *see also Kincaid*, 802 F. App'x at 188; *Spencer*, 2020 U.S. App. LEXIS 28051, at *4 ("[t]he district court must also find that the defendant is not a danger to the safety of any other

person or to the community") (internal quotation marks omitted). Section 3142(g) provides factors to be considered in making that "danger to the safety" of others determination.

The factors set forth in § 3553(a) "include, among others, 'the nature and circumstances of the offense'; the defendant's 'history and characteristics'; the need for the sentence imposed to reflect the seriousness of the offense, provide just punishment, and afford adequate deterrence; and the need to avoid unwarranted sentencing disparities." *Jones*, 2020 U.S. App. LEXIS 32451, at *6 (quoting 18 U.S.C. § 3553(a)(1), (2), (6)).

Moreover, "compassionate release is discretionary, not mandatory." *United States v. Chambliss*, 948 F.3d 691, 693 (5th Cir. 2020); *see also* 18 U.S.C. § 3582(c)(1)(A)(i) (stating that a court "may" reduce the term of imprisonment); *Keefer*, 2020 U.S. App. LEXIS 32723, at *7 ("The statute's plain text makes evident the discretionary nature of a compassionate-release decision," and "the statute lists factors that, when present, *permit* a district court to reduce a sentence") (emphasis in original).

The Bureau of Prisons has taken significant measures to protect inmates from Covid. On March 13, 2020, in accordance with its Coronavirus (COVID-19) Action Plan, BOP began to modify its operations to minimize the risk of COVID-19 transmission into and inside its facilities. Since that time, BOP has repeatedly revised the Action Plan to address the crisis. BOP has implemented modified operations to maximize social distancing. Only limited movement is afforded to facilitate commissary, laundry, showers, telephone, and computer access. Further, BOP has severely limited movement of inmates and detainees among its facilities and has implemented detailed screening and quarantine protocols. See www.BOP.gov/coronavirus.

In addition, Bureau of Prisons institutions are receiving vaccine allocations and worked

to make the vaccine available to staff and inmates as quickly as possible. More than 368,050 doses have been administered to BOP staff and inmates. See https://www.bop.gov/coronavirus/ (last visited August 9, 2022).

In an effort to assist inmates who are most vulnerable to the disease and pose the least threat to the community, BOP is also exercising greater authority to designate inmates for home confinement. On March 26, 2020, the Attorney General directed BOP to prioritize transferring inmates to home confinement in appropriate circumstances when those inmates are vulnerable to COVID-19 under the CDC risk factors. A subsequent memorandum from the Attorney General on April 3, 2020, further directed BOP to expand the range of inmates eligible for home confinement, as authorized by the CARES Act. See Section 12003(b)(2) of the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), Pub. L. No. 116-136, enacted March 27, 2020.

Since the Attorney General's memo on March 26, 2020, BOP has placed an additional 45,116 inmates on home confinement. See www.BOP.gov/coronavirus/ (last accessed July 26, 2022). Of these, 11 have died of COVID. Id.

The asserted extraordinary and compelling circumstances presented in the instant case relate to the significant health risk to Apostelos because of the COVID-19 pandemic and his underlying health conditions. Apostelos has been diagnosed with Pernicious Anemia that is akin to Thalassemia and Sickle Cell Anemia. Current information related to COVID-19 as issued by the Center for Disease Control ("CDC") indicates that those with Sickle Cell anemia are at an increased risk of serious illness or death with the contraction of COVID-19. These conditions in combination with his history of cardiovascular problems and cancer put Apostelos in

9

substantially greater danger than the average person considering the COVID-19 pandemic. PageID 1067-68.

Defendant's medical conditions place him at greater risk of serious illness or death from COVID-19. Defendant's confinement increases the likelihood that Defendant will suffer from complications due to COVID-19.

Apostelos submits that he has a second extraordinary and compelling reason for release; the need to be released to take care of his mother. Barbara Harper, who is 85 years old and whom Apostelos identifies as his mother, PageID 1081, has several ailments: Acid reflux, Acute gastric ulcer, adenomatous polyps, anemia due to blood loss, asthma, back pain, compression fracture of spine, hypertension, fracture of vertebra, generalized arthritis, left upper quadrant abdominal pain, lumbago, lumbar radiculopathy, numbness and tingling, profound anemia, scoliosis, and vitamin D deficiency. Harper has no one to assist her in managing these ailments. *Id.*

However, each of the cases that Apostelos cites in which an individual with medical conditions has been released because of COVID predates vaccines for the virus. Given the widespread availability of vaccines, a defendant's medical conditions do not mandate compassionate release. See *United States v. Lemons*, 15 F.4th 747, 751 (6th Cir. 2021) (despite hyper-thyroidism, vaccines rendered COVID neither compelling nor extraordinary); *United States v. Kennedy*, 2022 WL 43187, at *2 (6th Cir. Jan. 5, 2022) (vaccine rendered COVID insufficient to satisfy statute where defendant had "chronic obstructive pulmonary disease ("COPD")], sleep apnea, hypertension, thyroid issues, hepatitis c, and borderline diabetes"); *United States v. Fowler*, 2022 WL 35591 at *1-2 (6th Cir. Jan. 4, 2022) (vaccine rendered COVID insufficient to satisfy statute where defendant was "overweight, . . . [had] high blood

10

pressure and kidney problems, and had a previous gunshot wound to his right lung, among other medical issues"). Standing alone, COVID does not create an extraordinary and compelling reason for release.

Neither does Apostelos' claim that he must be released because his aging mother needs help taking care of various ailments prevail. See R. 167, Def. Motion at 1072. Apostelos has not demonstrated that Harper is his mother. Harper has submitted no affidavit confirming this relationship, and the PSR does not corroborate the claim. Moreover, Harper's circumstance is not so unique or compelling as to warrant Apostelos' premature release from prison. Nor has he established that there is no caregiver for Harper. While other family members – such as Apostelos sister and niece -- may not wish to expend the time or travel to assist her, their inconvenience does not satisfy the statutory standard. Whatever her physical health, it does not rise to an extraordinary or compelling reason for Apostelos's release. Cf. *United States v. Cruz-Rivera*, 2020 WL 5993352, at *5 (E.D. Pa. Oct. 9, 2020) ("A family member's illness, absent incapacitation or death, is not enough to constitute an extraordinary and compelling family circumstance").

An inmate's need or desire to care for an aging parent does not constitute an extraordinary and compelling reason for release. *United States v. Brewer*, Case No. 11-20537, 2022 WL 1125797, at *2 (E.D. Mich. Apr. 15, 2022) ("In general, having a sick or aging parent is not an extraordinary circumstance to release a prisoner."); *United States v. Daniels*, No. 3:19-cr-00204, 2022 WL 164543, at *4 (M.D. Tenn. Jan. 18, 2022) ("[M]any, if not all inmates, have aging and sick parents. Such circumstance is not extraordinary."); *United States v. Hill*, Case No. 1:20CR0425, 2022 WL 122639, at *2 (N.D. Ohio Jan. 13, 2022) (an inmate's desire to care for

11

elderly parents or grandparents is not "extraordinary" for compassionate release purposes). "[T]he inability to care for one's family as one would like is an inevitable, and again commonplace, consequence of criminal behavior and the incarceration that often results"; consequently, the inability to assist an aging parent does not satisfy the statutory threshold for release. See *United States v. Bright*, 2022 WL 2056191, at 2 (W.D. Tenn. June 7, 2022).

Additionally, the 18 U.S.C. § 3553(a) factors do not weigh in favor of Defendant's compassionate release. The Court must "consider the [sentencing] factors set forth in section 3553(a)to the extent that they are applicable." 18 U.S.C. § 3582(c)(1)(A). The applicable factors are: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed— (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; ... [and] (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct[.] 18 U.S.C.§3553(a). The statute also mandates: "The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2)." Id.

The section 3553(a) factors support Defendant's continued incarceration. The first factor is "'the nature and circumstances of the offense and the history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1). While Defendant has a limited criminal record, Apostelos committed an egregious offense. Over half-a-decade, he stole millions from over 200 investors

12

around the country. Multiple victims stated during his sentencing hearing that his actions left them financially and, in many cases, emotionally ruined. Given that many of his victims were near, or already in, retirement, they had no real means to recoup the losses that the defendant caused. Moreover, as the Court observed at sentencing, the offense was particularly callous given that Apostelos lied to his clients repeatedly. Add the sophistication of the scheme and Apostelos' leadership in it, his early release would improperly reflect a diminishment in the seriousness of this crime as well as its nature and circumstances.

Likewise, releasing Apostelos would undermine general and specific deterrents. Wiping away the lengthy remaining balance of his fifteen-year sentence does little to deter other individuals contemplating the commission of similar financial crimes. The prolonged nature of these offenses often presents a defendant with multiple opportunities to reflect on the potential consequences of his actions – including separation from their family – and perhaps cease his conduct. Where a court declines to impose a significant sentence upon a white-collar offender, "the message . . . is [sent] that would be white collar criminals stand to lose little more than a portion of their ill-gotten gains and practically none of their liberty." *United States v. Martin*, 455 F.3d 1227, 1241 (11th Cir. 2006). Indeed, even if the individual defendant poses little danger of re-offending, he should not receive a minimal sentence; "such a sentence" would be "grossly inappropriate" where, as here, a lengthy term of imprisonment will "carry[] substantial deterrent or punitive impact." Id. Given the deliberate, planned nature of this offense, keeping Apostelos' significant sentence in place promotes general deterrents. Likewise, the eight-year balance of his sentence promotes both specific deterrents and protects the public from this defendant.

At his sentencing, Apostelos appeared to express little genuine remorse for his conduct –

13

suggesting that he had not abandoned his criminal mindset. This was reflected in the length and sophistication of his scheme. Admittedly, older individuals – including fraud defendants – tend to commit less crimes. Yet, Apostelos was already in his fifties when he orchestrated this offense, undercutting his claim in this case of a correlation between criminality and age. The principle of deterrence does not support his release.

Additionally, section 3553 counsels against unwarranted sentencing disparities – which would occur if Apostelos' motion was granted. This sentencing factor reflects a desire to avoid national sentencing differences among similarly situated individuals. See *United States v. Simmons*, 501 F.3d 620, 623-24 (6th Cir. 2007). "One of the central reasons for creating the sentencing guidelines was to ensure stiffer penalties for white-collar crimes and to eliminate disparities between white-collar sentences and sentences for other crimes." *United States v. Davis*, 537 F.3d 611, 617 (6th Cir. 2008). Here, despite receiving a near-Guidelines sentence, Apostelos seeks his release after serving less than half of his term of imprisonment for an egregious financial crime. Releasing him now would promote unwarranted disparity, and therefore his motion lacks merit.

Defendant has not presented the Court with extraordinary and compelling reasons for early release. A reduction in sentence would not reflect the need for the sentence to reflect the seriousness of the offense, afford adequate deterrence, and protect the public similarly cuts against relief. See 18 U.S.C. § 3553(a)(2). In view of the § 3553 sentencing factors, compassionate release is improper here. *See* § 3582(c)(1)(A).

### III. CONCLUSION

Because Defendant William Apostelos does not meet the requirements necessary to be

granted relief under 18 U.S.C. § 3582(c)(1)(A), the Court **DENIES** Motion for a Reduction of Sentence Under the Compassionate Release Provisions Pursuant to 18 U.S.C. § 3582(c)(1)(A) and the First Step Act of 2018. (Doc. 167).

**DONE** and **ORDERED** in Dayton, Ohio on Monday, March 6, 2023.

s/Thomas M. Rose

THOMAS M. ROSE
UNITED STATES DISTRICT JUDGE